OPINION
{¶ 1} Dale Tobin was convicted by a jury in the Greene County Court of Common Pleas of one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4); ten counts of rape, in violation of R.C.2907.02(A)(2); and ten counts of gross sexual imposition, in violation of R.C. 2907.05(A)(1). The court sentenced Tobin to four years in prison for the violation of *Page 2 
 {¶ 2} R.C. 2907.05(A)(4), nine years in prison for each rape count, and eleven months in prison for each violation of R.C. 2907.05(A)(1). The four year sentence was to be served consecutively to one of the nine year sentences, with all other sentences to run concurrently to each other and to the aggregate thirteen year sentence. The court also found Tobin to be a sexually oriented offender and an aggravated sexually oriented offender.
 {¶ 3} Tobin appeals from his convictions and sentences, raising five assignments of error.
 {¶ 4} I. "THE TRIAL COURT DENIED MR. TOBIN HIS RIGHT TO DUE PROCESS UNDER ARTICLE I, SECTION 16 OF THE CONSTITUTION OF THE STATE OF OHIO AND AMENDMENT XIV OF THE CONSTITUTION OF THE UNITED STATES."
 {¶ 5} In his first assignment of error, Tobin claims that his due process rights were violated because he was convicted of multiple undifferentiated charges.
 {¶ 6} Counts One through Five of the state's indictment alleged gross sexual imposition, each occurring between February 1, 2003 and February 15, 2005, with C.J. as the victim. Counts Six through Ten alleged rape, between February 1, 2003 and February 15, 2005, with C.J. as the victim. Counts Eleven through Twenty alleged rape, each occurring between August 1, 2003, and February 4, 2005, with E.T. as the victim. Counts Twenty-One through Thirty alleged that Tobin had committed gross sexual imposition, with E.T. as the victim. E.T., Tobin's granddaughter, was approximately thirteen years old at the time of the offenses. C.J., a child who Tobin would babysit, was eight years old. (Tobin was acquitted of Count Two, and Counts Three through Ten were nolled. Accordingly, his conviction on Count One, the only conviction concerning C.J., is not at issue in this assignment.) *Page 3 
 {¶ 7} On appeal, Tobin claims that the state failed to present sufficient evidence to support his convictions for rape in Counts 16, 17, and 18 and for gross sexual imposition in Counts 23-30. See July 19, 2005 bill of particulars. Although Tobin initially notes that an indictment must differentiate between the various charges so that the defendant has adequate notice of the charges against him, his primary argument is that the state's evidence was insufficient to support all of his convictions because E.T. did not differentiate between several of the charges in her testimony.
 {¶ 8} "` [Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 430, 1997-Ohio-372,683 N.E.2d 1096, citing Jackson v. Virginia (1979), 443 U.S. 307, 319,99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 9} Tobin relies upon Valentine v. Konteh (C.A.6, 2005),395 F.3d 626, in support of his argument that his constitutional due process rights were violated when he was convicted of counts 16 through 18 and 23 through 30. In Valentine, the defendant was convicted of twenty counts of rape of a child, each of which was identically worded, and of twenty counts of felonious sexual penetration, each of which was also identically worded. The state did not *Page 4 
distinguish the factual bases for these charges in the indictment, in the bill of particulars, or at trial. At trial, the victim testified that she was forced to perform fellatio on "about twenty" occasions, that she was digitally penetrated on "about fifteen" occasions, and that she was anally penetrated on "about ten" occasions.
 {¶ 10} Addressing Valentine's habeas petition, the Sixth Circuit held that the indictment was constitutionally defective, because the undifferentiated charges failed to give the defendant adequate notice of the charges and did not protect him against double jeopardy. The Sixth Circuit commented that the "problem in this case is not the fact that the prosecution did not provide the defendant with exact times and places. If there had been singular counts of each offense, the lack of particularity would not have presented the same problem. Instead, the problem is that within each set of 20 counts, there are absolutely no distinctions made. Valentine was prosecuted for two criminal acts that occurred twenty times each, rather than for forty separate criminal acts. In its charges and in its evidence before the jury, the prosecution did not attempt to lay out the factual bases of forty separate incidents that took place. Instead, the 8-year-old victim described `typical' abusive behavior by Valentine and then testified that the `typical' abuse occurred twenty or fifteen times. Outside of the victim's estimate, no evidence as to the number of incidents was presented." Id. at 623-33. The court noted that "[t]he due process problems in the indictment might have been cured had the trial court insisted that the prosecution delineate the factual bases for the forty separate incidents either before or during the trial." Id. at 634.
 {¶ 11} We find Valentine to be applicable to this case. Here, counts 16 through 18 were identically worded in the indictment, and counts 23 through 30 were all identical to each other *Page 5 
(as well as to counts 21 and 22); the indictment merely tracked the language of the statute. The July 19, 2005 bill of particulars provided a date range for each offense and a brief description of the factual bases for the charges. However, counts sixteen and seventeen were identically worded in the bill of particulars, and counts 23 through 30 were also all identical to each other. Count 18 differed from counts 16 and 17 only in the date provided: counts 16 and 17 stated "between June 1, 2004 and December 1, 2004" while count 18 stated December 2004.
 {¶ 12} E.T. testified at trial that, during the summer of 2004, she was usually home alone while her mother, step-father and uncle were at work and while her brother was at her grandparents' home. There were times, however, when Tobin, her grandfather, would come to her house. During one visit, Tobin asked E.T. to see something upstairs. After going upstairs, Tobin shut the door, started kissing and sucking on E.T.'s breasts, performed oral sex on her, and had E.T. perform oral sex on him. E.T. testified that this occurred on "at least four" occasions during the summer of 2004.
 {¶ 13} After describing this incident at her home, E.T. was asked if she remembered any other occasions where he came to her home other than those four occasions. E.T. described another incident where Tobin was seated in a blue chair in her house, and he asked her to come in front of him and to lift her shirt. Tobin then sucked and kissed on her breasts. Tobin then told her to go upstairs, where he asked her to perform fellatio and he performed cunnilingus.
 {¶ 14} With regard to counts 21-30, E.T. testified that, during the fall of 2003 and most of 2004, she had a newspaper route where she delivered the Xenia Gazette six days per week. E.T.'s mother, uncle, and Tobin assisted her by driving her along her route; Tobin drove her around three or four times per week. E.T. testified that, after completing the route, Tobin "took *Page 6 
what was called the long way home." During that time, Tobin fondled E.T.'s breasts and had her perform fellatio while he continued to drive. E.T. identified two specific incidents where Tobin fondled her breasts and had her perform oral sex in the truck while it was moving. She also stated that there was one incident when the vehicle was not moving; she stated that this occurred in a country area around Xenia. E.T. stated that Tobin touched her in the truck "ten or more" times.
 {¶ 15} E.T.' s testimony regarding Tobin's sexually abusive conduct during the summer of 2004 supported the two counts of rape set forth in counts fifteen and eighteen. E.T. adequately described the first incident during summer 2004, and an additional incident which began with Tobin seated in the blue chair. However, there was no additional testimony regarding separate incidents other than E.T.'s statement that similar incidents occurred "at least four" times. This statement, without additional details or corroborating evidence, is insufficient to support the identically-worded charges in counts sixteen and seventeen.
 {¶ 16} Likewise, E.T.'s testimony was insufficient to support all of the charges of gross sexual imposition that occurred in Tobin's truck while he was assisting E.T. with her newspaper delivery route. As stated above, E.T. described two specific occasions during which Tobin fondled her breasts and required her to perform oral sex on him while he was driving the truck. These descriptions were sufficient to support his convictions for gross sexual imposition as charged in counts 21 and 22. In addition, E.T. described a third incident in a country area near Xenia. E.T.'s testimony regarding this incident supported an additional count of gross sexual imposition.
 {¶ 17} E.T. did not present any additional evidence other than her statement that Tobin *Page 7 
touched her in the truck on "ten or more" occasions. Again, without additional details to distinguish the remaining seven gross sexual imposition counts from the others, the state's evidence was insufficient to support those charges.
 {¶ 18} Although we have not detailed E.T.'s testimony in its entirety, we note that E.T. testified to several incidents of sexual abuse by Tobin, including additional events in August 2003 and December 2003. E.T. recalled when, where, and how the sexually abusive conduct occurred. We find that her testimony was sufficient to support his convictions on counts 11 through 15 and 18 through 23.
 {¶ 19} Tobin's first assignment of error is sustained as to counts 16 and 17 and counts 24 through 30.
 {¶ 20} II. "MR. TOBIN WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS."
 {¶ 21} In his second assignment of error, Tobin claims that his trial counsel was ineffective by permitting the state to play a videotape of Detective Alonzo Wilson's interrogation of Tobin, during which Wilson "repeatedly vouch[ed] for the credibility of [C.J.] and [E.T.] in this case," in contravention of State v. Boston (1989), 46 Ohio St.3d 108,545 N.E.2d 1220.
 {¶ 22} In order to demonstrate ineffective assistance of counsel, Tobin must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, *Page 8 538 N.E.2d 373. "Reversal of a conviction for ineffective assistance of counsel `requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" State v. Hand, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d. 151, at ¶ 199. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S at 694;Bradley, 42 Ohio St.3d at 142.
 {¶ 23} Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. SeeStrickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.;State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 24} On appeal, Tobin states that his trial counsel was ineffective by permitting the state to play a videotape of Wilson's interrogation of Tobin during which Wilson vouched for the victims' credibility. (We note that, at Tobin's counsel's request, several sections of the videotape were not played for the jury. In particular, those portions which discussed allegations that Tobin had sexually assaulted his daughter when she was a child were not aired to the jury.)
 {¶ 25} In Boston, the Supreme Court of Ohio held that an expert may not comment on the credibility or veracity of a witness. This court has stated that the rule announced in Boston applies to police officers as well as expert witnesses, because a juror is likely to perceive an officer as an expert and because the rule applies to lay persons as well as experts. State v. Miller *Page 9 
(Jan. 26, 2001), Montgomery App. No. 18102; State v. Travis,165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237, ¶ 53.
 {¶ 26} As noted by Tobin, the Sixth District has addressed whether a trial court properly admitted a videotape of a police interview during which the officer commented on the credibility of the victim, a five-year old child who alleged that her mother's boyfriend had had sexual contact with her. State v. Rogers (May 6, 1994), Erie App. No. E-93-20. In Rogers, the officer stated during the interview that the child sounded very believable, that he could see no reason for her to fabricate the allegations, and that he believed there was a 100% chance that she was telling the truth. On review, the appellate court held that it was impermissible for a police officer to be declared an expert on the subject of child abuse and for the state then to play a videotape of the officer's interview of the defendant, during which the officer expressed his opinion of the veracity of the child-victim. The appellate court reasoned:
 {¶ 27} "[A] party cannot circumvent the holding in Boston by calling a witness to the stand, having him declared an expert, and then playing of videotape of that witness expressing his belief, during an interrogation of the accused, that the child declarant is truthful. In addition, by allowing [the officer] to testify through the videotape as to his belief in [the child's] veracity, [the officer] was assessing the credibility of [the child], who testified at the trial below. Such testimony is impermissible as it is the duty of the trier of fact to assess the credibility of witnesses, not the duty of any individual witness." (Citation omitted).
 {¶ 28} We agree with the general proposition that the state cannot circumvent Boston by presenting objectionable evidence via videotape rather than asking the expert to testify to the victim's credibility while on the witness stand. *Page 10 
 {¶ 29} Turning to the case before us, in order to determine whether Tobin's counsel's representation fell below an objective standard of reasonableness, we begin with whether Wilson's statements during the police interrogation fell within Boston.
 {¶ 30} Tobin cites to nine instances where Wilson allegedly vouched for the credibility of C.J. or E.T., as follows:
 {¶ 31} Q [Wilson]: "Well, you brought up imagination.
 {¶ 32} A [Tobin]: "She's [C.J.] got one. I know that.
 {¶ 33} Q: "Okay. I know. Okay. Let's just say a little eight-year-old's got an imagination. Do you think she can come up with those things you just — I just described to you?
 {¶ 34} A: "I don't know. You know as well as I do that kids nowadays-
 {¶ 35} Q: "No. I don't know an eight-year-old girl that can come upwith that kind of imagination.
 {¶ 36} A: "I know better than that too-
 {¶ 37} Q: "Okay."
 {¶ 38} A: " — with the business you're in.
 {¶ 39} Q: "All right. Now, you're right, I'm in a business of beingaround a lot of eight-year-olds and six-year-olds and five-year-olds andall of them in situations they shouldn't be in. But none of them withoutbeing — something happened to them have come up with an imagination likeshe [C.J.] described.
 {¶ 40} So, I'm just trying to see if maybe that is a fact were you just cleaning her. You know, I was hoping there must be some other explanation of how — why she describes it this way. Is there some other — something I'm not — I don't know about in other words? *Page 11 
 {¶ 41} " * * *
 {¶ 42} Q: "Okay. Let's step up here a little further then, Dale.An eight-year-old makes up this story, okay. She makes it up. She's asmart eight-year-old and she makes it up. Let's just throw it off asthat, okay. She doesn't remember it. That couldn't have happened. Imean, does she get it off a movie? I don't know. But let's say she madeit up.
 {¶ 43} "Now, let's step up here a little bit. Let's go a little up in age. Let's go to a 13-year-old named [E.T.] who didn't know anything-
 {¶ 44} "* * *
 {¶ 45} "Here's the point I'm trying to make. I'm giving you a chance today to tell me because you know what I think you do, I think you actually take these girls over there and little [C.J.] and you do all kinds of terrible things to her in her vaginal area, her butt area. Let's go up to [E.T.] You're actually doing terrible things to [E.T.] And you're trying to play it off. You want me to believe this eight-year-old is just making this stuff up. I'm like okay, you reallythink I'm going to have — that someone's going to believe theeight-year-old is going to make up all the stuff that she told us.
 {¶ 46} "* * *
 {¶ 47} "This is your opportunity to say, I did that because I thought she had something wrong with her, I was checking for something. This is your opportunity to say it because I know it happened because now I gottwo girls telling me it happened. So, I' m asking you, you know, is there some thing to tell me to explain what these girls are saying.
 {¶ 48} " * * *
 {¶ 49} "Okay. You know, and if she [E.T.] wanted this stuff, if she's saying, Grandpa, *Page 12 
that feels good, can you do a little more or whatever, that's want I want to know. I want to know the fact that did you actually do this stuff `cause you just wanted to do it? You know, a 13-year-old, she's curious, that felt good, Grandpa, can you do this yet. Anything. I'm looking for — I don't want to put words in your mouth, but I'm sayingI know this stuff happened and she went into details. That's how I knew about some other of this stuff. But I don't know what you're going to tell. I'm waiting to say, well, is he going to come up with some type of explanation.
 {¶ 50} " * * *
 {¶ 51} Q: "Now, let's talk about that seeing as how you brought that up. You haven't had an erection.
 {¶ 52} A: "(no audible response.)
 {¶ 53} Q: "You know what oral sex is; right?
 {¶ 54} A: "Yeah.
 {¶ 55} Q: "Because she mentioned some stuff about that too. Dale,these girls aren't making this stuff up, okay.
 {¶ 56} A: "I'm trying to think you are.
 {¶ 57} Q: "No, I'm not. I wouldn't be here. I don't make up things. I wouldn't be sitting here talking to you if I made up things. I also wouldn't know how to walk in your house and say where's the vibrator at. I wouldn't know that. I don't know your house that well. I never been in your house before.
 {¶ 58} " * * *
 {¶ 59} Q: "And, you know, I was hoping you'd come in here and say, you know what, it *Page 13 
didn't go as far as they said or something `cause I know they're notmaking it up just like you know they're not making it up. And I was hoping you'd come in here and say something like, you know what, it went — one day she was curious or just anything, she was curious one day and I wanted to show her or whatever, just something.
 {¶ 60} " * * *
 {¶ 61} [Wilson showed Tobin the charges against him.]
 {¶ 62} A: "All I can say is I didn't do all, but you'll have to prove it.
 {¶ 63} Q: "You didn't do all?
 {¶ 64} A: "No.
 {¶ 65} Q: "But did you do some of it? Is that what you're saying? That's what it sounds like. But you know what, I know you did itall and you're right, we have to prove it in the court. * * *" (Emphasis added.)
 {¶ 66} Upon reviewing the interview in its entirety, we do not find all of the instances cited by Tobin to be problematic. In particular, Wilson was not asserting that C.J. was credible when he remarked "let's say she [C.J.] made it up" and began to discuss E.T. However, we are particularly troubled that the jury heard Wilson's statement that he was in "a business of being around a lot of eight-year-olds" and suggesting that none had described the sexual conduct involved from their imaginations and without something having happened to them. This comment invited the jury to rely upon Wilson's expertise as an officer who had previously investigated sexual abuse of children and to accept his assertion that C.J. would not have fabricated her specific allegations due to her imagination. This comment was followed by other statements that C.J. and E.T. were not "making this up." *Page 14 
 {¶ 67} In our view, Wilson's statements during the interview constituted improper evidence of a perceived expert as to the veracity of the children's allegations. Accordingly, Tobin's counsel should have objected to the playing of these portions of the videotape of Tobin's interrogation, and his failure to do so, in light of Boston, was unreasonable.
 {¶ 68} Tobin argues that the jury's viewing of the videotape was prejudicial, because C.J.'s and E.T.'s credibility "was the central issue in the case. It was their word against Mr. Tobin's." Tobin notes that a physical examination revealed no evidence of sexual abuse on either C.J. or E.T.
 {¶ 69} Because the charges regarding CJ. and E.T. were distinct and separate, we review the evidence as to each child separately.
 {¶ 70} CJ. testified that she would go to Tobin's home before school because Patty Tobin, her babysitter and Tobin's daughter, had to go to work. C.J. also went to Tobin's house after school. CJ. testified that, while she was in the bathroom at Tobin's house, Tobin instructed her to undress. Tobin then touched her "privates" with his finger.
 {¶ 71} Wilson testified that he informed Tobin of the charges by E.T. and C J. and asked him if the girls were lying. Wilson testified that Tobin told him that if the children were lying, he would tell him; Wilson stated that Tobin never indicated that the children were lying. Wilson also testified that, after viewing the charges, Tobin stated "Not all of those are true."
 {¶ 72} Jennifer Stutesman, Tobin's girlfriend for the last 26 years, testified on Tobin's behalf that she and Tobin would usually watch television and drink coffee while CJ. was at their home in the morning, and that they often fed C J. After C J. ate, they would tell her to wash her face and get ready for school. C J. went into the bathroom at their house, but *Page 15 
Stutesman stated that there were no opportunities for Tobin to enter the bathroom and be alone with C. J. without Stutesman noticing. Stutesman later admitted that there may have been times that Tobin was alone with C.J. Testifying on his own behalf, Tobin denied that he molested C.J. He specifically denied touching her chest, vaginal area, or bottom. There was no physical evidence substantiating the alleged abuse.
 {¶ 73} With regard to C.J., we agree with Tobin that Wilson's videotaped statements were prejudicial. Wilson's statements strongly supported C.J.'s credibility by suggesting that he had had a lot of experience with children near C.J.'s age and that an eight-year old's imagination would not include the allegations CJ. made. There was no evidence, other than C.J.'s statements and Tobin's statements to Wilson, to support the claims concerning CJ. More significantly, the jury asked during deliberations whether it could consider the evidence concerning E.T. to make a verdict on C.J.'s charges. This strongly suggests that the jury did not believe that the state's evidence regarding CJ. — by itself — was sufficient to support a conviction. In sum, the playing of the videotaped interview undermines our confidence in Tobin's conviction on count one, and that conviction must be reversed.
 {¶ 74} Turning to E.T., E.T. described at trial numerous incidents where she was asked to perform fellatio and where Tobin performed cunnilingus on her. E.T. testified that in August 2003, Tobin was putting lotion on her back in Tobin's bedroom; E.T. indicated that she had very dry skin and needed to have lotion applied often to avoid the skin cracking. E.T. stated that Tobin told her to remove her shirt and then sucked on her breasts. Tobin then told E.T. to remove her shorts; afterward, he sucked and kissed her vagina. Tobin also told E.T. to kiss and put her mouth around his penis. E.T. testified that Tobin's penis was not erect and that he did *Page 16 
not ejaculate. Afterwards, Tobin told E.T. to lie on the bed again, and he inserted two fingers into her vagina.
 {¶ 75} In December 2003, E.T. was staying at Tobin's home while her brother recovered from surgery. On one Friday when E.T. was alone with Tobin, Tobin told E.T. to go back to the bedroom and take off her clothes. When she did not, Tobin told her to take off her clothes again. Tobin instructed E.T. to perform fellatio, which she did, then he performed cunnilingus on her and sucked and kissed her breasts. Tobin then told E.T. to lie on the bed, and he moved a vibrator in and out of her vagina. E.T. identified the vibrator, which was marked as state's exhibit 1.
 {¶ 76} As detailed above, E.T. also testified that Tobin engaged in sexual activity with her on several occasions while returning from delivering newspapers and in the summer of 2004.
 {¶ 77} Mark Losko, a forensic scientist in the DNA serology section of the Ohio Bureau of Criminal Identification and Investigation, testified that DNA consistent with E.T. was found on the vibrator identified by E.T. (this was also referred to as a dildo); Losko did not find DNA on a second "sex toy" seized from the same drawer in Tobin's bedroom.
 {¶ 78} Again, Wilson testified that he informed Tobin of the charges by E.T. and C.J. and asked him if the girls were lying. Wilson testified that Tobin told him that if the children were lying, he would tell him; Wilson stated that Tobin never indicated that the children were lying. Wilson also testified that, after viewing the charges, Tobin stated "Not all of those are true."
 {¶ 79} In his defense, Stutesman testified that Tobin drove E.T. on her paper route *Page 17 
"occasionally" and that she went with him most of the time. Stutesman stated that E.T.'s brother would also usually come with her. Stutesman indicated that the route would take approximately one-half hour and that she never noticed them return late or slower than usual. Stutesman further stated that E.T. had opportunities to play in Tobin' s and her bedroom without being noticed and that E.T. could have had access to her vibrator. Stutesman also testified that E.T. had a disagreement with Tobin when Tobin refused to buy E.T. a car. On cross-examination, however, Stutesman also admitted that there were multiple times that Tobin was alone with E.T. while delivering newspapers and in the house. Stutesman stated, though, that she believed the accusations were lies.
 {¶ 80} During his testimony, Tobin categorically denied all of E.T.'s allegations. He denied touching her vaginal area and fondling her breasts. He also denied showing or using a vibrator on E.T. or touching E.T. while he was driving his vehicle. Tobin indicated that he "didn't believe in" oral sex because "the Bible says that's a no-no." Tobin expressed that E.T. "lies a lot and then tries to cover it up." Tobin acknowledged that he was impotent.
 {¶ 81} Upon review of the evidence, we do not find that there was a reasonable probability that the result of the trial regarding E.T.'s charges would have been different had the videotaped interview not been played. Most of the objectionable portions of the videotape concerned statements that Wilson made while discussing C.J.'s — not E.T.'s — allegations. Wilson repeatedly referred to the fact that an eight-year old would not have the imagination to fabricate the allegations that C.J. presented. After raising E.T.' s allegations with Tobin, Wilson referred to the fact that both girls had made allegations. However, Wilson's statements in this respect merely verbalized what the jury already knew from having heard the testimonies of both *Page 18 
C.J. and E.T. at trial. On the videotape, Wilson stated to Tobin that he knew what happened to E.T. because she had provided details. When the jury heard the videotape, E.T. had already testified and provided detailed evidence of several incidents where Tobin touched her breasts and vaginal area, required her to perform fellatio, and performed cunnilingus.
 {¶ 82} Moreover, Tobin made statements during the interview that supported the state's case. As testified by Wilson at trial, Tobin read the charges and stated that "Not all of those are true." Wilson also testified at trial that Tobin had not stated during the interview that the girls were lying. Tobin stated during the interview that "a lot of things has got blowed out of proportion." Although Tobin denied at trial that he had put lotion on E.T. while in the bedroom, Tobin admitted in his interview with Wilson that he had put "oil" on E.T. as she laid on the bed and that E.T. would "get out of the shower. I put a little bit of oil on her. She gets dressed."
 {¶ 83} After the videotape was shown, E.T.'s statement that a vibrator was inserted into her vagina was corroborated by Losko's testimony that her DNA was present on a vibrator found in Tobin's bedroom. E.T. also testified that Tobin's penis was not erect when she performed oral sex, which was consistent with Tobin's admission that he is impotent. Although Stutesman provided evidence that Tobin lacked opportunities to commit the offenses, her testimony was undermined during cross-examination, and it was contradicted at times by Tobin himself.
 {¶ 84} Although Tobin repeatedly denied that he had committed the offenses against E.T., we do not find that videotape of Wilson's statements during his interview with Tobin undermines our confidence in the outcome of the trial regarding the charges related to E.T. While there is a possibility that the objectionable portions of Wilson's statements on the *Page 19 
videotape were considered by the jury, we do not find a reasonableprobability that the outcome would have been different on the charges concerning E.T.
 {¶ 85} The second assignment of error is sustained in part and overruled in part.
 {¶ 86} III. "THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY THAT IT COULD CONSIDER TESTIMONY OR EVIDENCE IN E.T.' S CASE TO MAKE A VERDICT ON C.J.'S CASE THEREBY DENYING MR. TOBIN HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS."
 {¶ 87} In his third assignment of error, Tobin asserts that the trial court provided an erroneous response to a question by the jury during its deliberations.
 {¶ 88} "Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request."State v. Carter, 72 Ohio St.3d 545, 1995-Ohio-104, 651 N.E.2d 965, paragraph one of the syllabus. "A reversal of a conviction based upon a trial court's response to such a request requires a showing that the trial court abused its discretion." Id. at 553.
 {¶ 89} Following closing arguments, the court provided instructions to the jury, which included an instruction on how to consider multiple counts. It stated:
 {¶ 90} "Consider these counts separately. The charges set forth in each count in the Indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately, and you must state your findings as to each count uninfluenced by your verdict as to any other count.
 {¶ 91} "The Defendant may be found guilty or not guilty of any one or all of the *Page 20 
offenses charged."
 {¶ 92} While the jury was deliberating, it asked the following question in writing: "Can we consider testimony/evidence in [E.T.]'s case to make a verdict on [C.J.]'s case?"
 {¶ 93} The court's written response stated: "Each charge is separate and distinct and must be considered uninfluenced by your verdict(s) on other charges. In deciding any count or charge you should consider all the evidence presented at trial that has bearing or will assist you in deciding that count or counts." Tobin objected to the second sentence of the court's response.
 {¶ 94} Tobin claims that trial court's answer, in effect, told the jury "yes," i.e., they could consider evidence or testimony in E.T.'s case in making a verdict in C.J.'s case. The state argues that the two sentences must be read together, and that the first sentence qualifies the second. The state also argues that evidence of Tobin's conduct toward E.T. could be used at the trial on the charges related to C.J. to show a common plan or scheme and as proof of Tobin's intent for purposes of sexual gratification and of the absence of mistake in touching their genitals.
 {¶ 95} We agree with Tobin that the trial court's response to the jury's question did not limit the jury to considering only the evidence applicable to C.J. when considering the charges related to her. We further agree that the trial court erred when it informed the jury that it could consider "all the evidence" that would assist them in making a verdict on C.J.'s case, because it, in effect, invited them to consider Tobin's acts toward E.T.
 {¶ 96} "In general, the introduction of evidence tending to show that an accused has committed any crime wholly independent of that offense for which he is on trial is forbidden. Exceptions to the general rule `are made where the prior offense is part of a common plan or *Page 21 
scheme or where it tends to prove motive, intent, knowledge or identity, not because the prior acts prove that defendant is crime prone, butin spite of such fact.' Exceptions to the general rule are premised on the basis that `the circumstances involved in the prior offense or offenses comprise substantial probative evidence of guilt of the particular offense in question, and the incidental fact that this same evidence proves another crime does not stand in the way of receiving such evidence for its permitted use.
 {¶ 97} "In State v. Flonnery (1972), 31 Ohio St.2d 124, 129, the court held:
 {¶ 98} "`Where evidence has been admitted for a limited purpose which the state claims shows the defendant did certain "other acts" which show the motive or intent of the accused, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question which is alleged in the indictment, the jury should be instructed that such evidence must not be considered by them as any proof whatsoever that the accused did any act alleged in the indictment.'" (Citations omitted) (emphasis sic) State v. Tyler (Dec. 30, 1994), Franklin App. Nos. 94APA03-282, 94APA03-283.
 {¶ 99} By informing the jury that it could consider all evidence that would assist it in rendering a verdict, the trial court implied that the jury could consider evidence concerning E.T. for an improper purpose. The charges concerning E.T. and C.J. appear to have been joined on the ground that they constituted separate and distinct charges, and not for the purpose of establishing motive or the absence of mistake or accident. Moreover, the court did not provide an "other acts" instruction limiting the use of evidence regarding Tobin's conduct toward the girls. In our view, the trial court's response prejudicially tainted the jury's verdict on count one, the sole conviction related to CJ. Accordingly, Tobin's conviction on count one must be *Page 22 
reversed.
 {¶ 100} Although the trial court's response constituted prejudicial error concerning Tobin's conviction on count one, we find no evidence that the response had the same prejudicial effect on Tobin's convictions concerning E.T. The jury's question asked whether the evidence concerning E.T.'s case could be considered in deciding C.J.'s case; it did not ask the converse — whether the evidence concerning C.J.'s case could be considered to make a verdict on E.T.'s case.
 {¶ 101} E.T.'s case was the stronger of the two. Although there was no evidence from a physical examination of the victims to support sexual activity, E.T. testified that Tobin's penis was not erect and that he did not ejaculate during fellatio, which was consistent with Tobin's and Stutesman's testimony that Tobin has not been able to have an erection due to medical reasons for several years. E.T.'s DNA was found on the vibrator, which E.T. testified Tobin had inserted into her vagina. Although Tobin denied that he engaged in sexual activity with E.T. or C.J., he never indicated to Wilson that the children were lying, and he stated that "not all of [the charges] are true," which suggested that some might be true. Whereas C.J.'s case relied almost exclusively upon her testimony, E.T.' s case was supported by some additional evidence. Considering the wording of the jury's question and the record as a whole, we find that the trial court's erroneous clarification of the jury instructions was harmless beyond a reasonable doubt as to the counts related to E.T.
 {¶ 102} The third assignment of error is sustained in part and overruled in part.
 {¶ 103} IV. "THE TRIAL COURT ERRED WHEN IT SENTENCED MR. TOBIN TO MORE THAN MINIMUM AND CONCURRENT TERMS OF *Page 23 
IMPRISONMENT."
 {¶ 104} In his fourth assignment of error, Tobin claims that the court's imposition of non-minimum and consecutive sentences was unconstitutional and that the matter should be remanded for resentencing, pursuant to State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, 845 N.E.2d 470, and State v. Mathis, 109 Ohio St.3d 54,2006-Ohio-855, 846 N.E.2d 1.
 {¶ 105} Tobin argues that, upon remand, the trial court should be instructed that only minimum and concurrent sentences may be imposed. Tobin argues that "Ohio courts are precluded by the Due Process Clause from applying Foster's remedy to defendants whose criminal conduct pre-date the release of the opinion." Although he acknowledges that theex poste facto clause does not apply to the judicial branch of government, he asserts that "limitations on ex poste facto judicial decision making are inherent in the notion of due process." App. Br. at 22, quoting Rogers v. Tenn. (2001), 532 U.S. 451, 456, 121 S.Ct. 1693,149 L.Ed.2d 697. Specifically, he argues that "[i]f a state legislature is barred by the Ex Post Facto Clause from passing [a retroactive law], it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." Id., quoting Bouie v. City of Columbia (1964),378 U.S. 347, 353-54, 84 S.Ct. 1697, 12 L.Ed.2d 894.
 {¶ 106} Tobin's sentencing hearing was held on November 30, 2005, and the court filed its sentencing entry on the following day. Because the trial court relied upon factors that the supreme court later held were unconstitutional, Foster requires resentencing in this case.
 {¶ 107} We reject, however, Tobin's request that we instruct the trial court to impose minimum and concurrent sentences at the new sentencing hearing. In Foster, the *Page 24 
supreme court stated that, upon remand, the trial court "shall consider those portions of the sentencing code that are unaffected by[Foster] and impose any sentence within the appropriate felony range." Id. at ¶ 105. We note that R.C. 2929.11 and R.C. 2929.12, which set forth statutory "considerations" and do not require factfinding, were not affected by Foster. Mathis at ¶ 38. The supreme court specifically noted that, while a defendant may argue for a reduction in his sentence, nothing prevents the state from seeking greater penalties. Id. The trial court is free to impose either the same or a different sentence on remand.
 {¶ 108} As an Ohio court inferior to the Supreme Court of Ohio, we are required to follow the supreme court's mandates, and we lack the jurisdictional power to declare a mandate of the Supreme Court of Ohio to be unconstitutional. State v. Durbin, Greene App. No. 2005-CA-134,2006-Ohio-5125, at ¶ 42. Accordingly, Tobin's argument that the mandate of the supreme court in Foster violates the United States Constitution is not cognizable in this court.
 {¶ 109} The fourth assignment of error is sustained.
 {¶ 110} V. "THE TRIAL COURT ERRED IN CLASSIFYING MR. TOBIN BOTH AN AGGRAVATED SEXUALLY ORIENTED OFFENDER THAT MUST REPORT FOR LIFE AND A SEXUALLY ORIENTED OFFENDER THAT MUST REPORT ANNUALLY FOR TEN YEARS."
 {¶ 111} In his fifth assignment of error, Tobin claims that the trial court erred in classifying him as both an aggravated sexually oriented offender and a sexually oriented or child-victim offender.
 {¶ 112} As noted by the trial court, the rape offenses (counts 11 through 20) are defined as aggravated sexually oriented offenses, which automatically imposes the classification *Page 25 
of aggravated sexually oriented offender. R.C. 2950.01(O). The trial court also imposed the sexually oriented offender classification based on the recommendation of the state that Tobin be classified as a sexually oriented offender. The court advised Tobin of his reporting requirements as an aggravated sexually oriented offender.
 {¶ 113} Tobin claims that, since he has been classified as an aggravated sexually oriented offender, he should not also be classified as the "lesser included" sexually oriented offender. Tobin relies uponState v. Owens (Nov. 24, 1999), Cuyahoga App. No. 75434, in which the Eighth District held that the trial court should not have imposed reporting requirements under both sexual predator and sexually oriented offender classifications. The Owens court stated:
 {¶ 114} "The trial court technically did not err in finding that appellant was a sexually oriented offender. The determination that someone is a sexually oriented offender is automatic upon conviction of certain offenses, and does not require a finding by the court. SeeState v. Erwin (Sep. 2, 1999), Licking App. No. 99-CA-54, unreported;State v. O'Neil (Aug. 4, 1999), Lorain App. No. 97CA006982, unreported. It was error for the trial court to state in its journal entry that appellant would be subject to the reporting and other requirements for a sexually oriented offender, as well as the requirements for a sexual predator. Appellant should not be required to report every ninety days from the registration date as a sexual predator, as well as annually from the anniversary date as a sexually oriented offender. See generally R.C. 2950.06. The trial court should determine what set of requirements the defendant must follow as either a sexually oriented offender, habitual sexual offender or sexual predator. See State v. Cook (1998),83 Ohio St.3d 404. To avoid confusion, the best practice would be to classify the *Page 26 
defendant as only one of the three categories."
 {¶ 115} The Eighth District modified the trial court's journal entry, deleting the portion that classified Owens as a sexually oriented offender and imposed the reporting requirements for that classification.
 {¶ 116} Although Tobin's classification as a sexually oriented offender places little, if any, additional burden on him, we agree that the proper course is to impose one set of reporting criteria. The trial court informed Tobin of the aggravated sexually oriented offender reporting requirements, and the state indicates that it would be satisfied with these requirements.
 {¶ 117} The trial court's "judgment entry and notice of duties to register as an offender of a sexually oriented offense" is modified to delete the finding that Tobin is a sexually oriented offender or child-victim offender. The finding that Tobin is an aggravated sexually oriented offender and the requirements attendant to that classification remain unchanged.
 {¶ 118} The fifth assignment of error is sustained.
 {¶ 119} The judgment of conviction will be affirmed in part, reversed in part, and remanded for resentencing.
 {¶ 120} The judgment regarding Tobin's sexual offender classification is modified to delete the finding that Tobin is a sexually oriented offender or child-victim offender.
FAIN, J. and WALTERS, J., concur.
(Hon. Sumner E. Walters retired from the Third District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio). *Page 1