[Cite as *State v. Evans*, 2011-Ohio-5415.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                        :          C.A. CASE NO.   24032

v.                                               :          T.C. NO.   09CR3184

RICHARD A. EVANS                                 :        (Criminal appeal from
                                                Common Pleas Court)
    Defendant-Appellant                       :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    21st   day of    October   , 2011.

. . . . . . . . . .

CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 424 Patterson Road, Dayton, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Richard A. Evans was found guilty by a jury of two counts of felonious assault, two counts of murder, two counts of involuntary manslaughter, and one count of having a weapon under disability. He was sentenced to an aggregate term of twenty years to life in prison. He appeals from his convictions.

I

{¶ 2}   On the evening of Friday, September 25, 2009, Evans and Stephen Moody went separately to the Higgins Station Bar with various friends, family members, and acquaintances.   Both men were still present when the bar closed at 2:00 a.m. on Saturday, September 26, 2009.

{¶ 3}   For the most part, the numerous witnesses who testified for the State gave consistent testimony about the events that transpired that evening. According to all of the witnesses, there were no problems inside the bar during the course of the evening, but when the bar closed, several altercations broke out in the parking lot among the departing patrons.   The witnesses estimated that twenty to forty people were in the parking lot shortly after the bar closed.   The witnesses stated that one woman was "jumped" and hit with a bottle by several other women, a man who tried to intervene was sprayed with mace, and other men were throwing punches.   The witnesses testified about chaotic fighting in the parking lot; some of the details varied, but most are not pertinent to this appeal.   At least two people, including the bar's security personnel, called the police soon after the fighting broke out.

{¶ 4}   Several witnesses testified that, while the fighting in the parking lot was underway, Evans drew a gun and waved it at the crowd, but not at anyone in particular.   One witness testified that Evans said "[E]verybody back the F up."   No one else was observed with a gun.

{¶ 5}   Several witnesses also testified that they saw Evans walk past Moody and hit him on the left side of the head.   The two men had not argued during the

course of the evening, and none of the witnesses was aware of animosity between them. Moody did not take any defensive measures as Evans approached him. Most of the witnesses saw only the backside of Evans's hand as he hit Moody, but one witness testified that she saw the butt of a gun in Evans's hand as he struck Moody. All of the witnesses testified that, after Moody was struck with one blow to the left side of his head, he dropped immediately to the ground, unconscious.

{¶ 6} Moody's friends and family transported him to Good Samaritan Hospital while the police tried to get control of the chaos in the parking lot. Moody was transferred to Miami Valley Hospital soon thereafter, where he remained in a coma until his death from his head injury in early October 2009.

{¶ 7} The coroner testified that Moody had suffered a "very large fracture" of his skull that extended from his left ear to the right side of his head and that he had suffered bleeding and swelling of his brain. The coroner opined that a fist "could make" the type of rectangular- or trapezoidal-shaped abrasion found on Moody's left ear, but that Moody's injury was "[not] consistent with just being punched with the naked fist." He stated that the type of injury observed in this case "does not happen just with trivial trauma, okay. This is a significant blow to damage this part of the skull and the other areas" shown in the autopsy photographs. The coroner also testified that the injury was "so severe that it actually *** sheared off many of the small blood vessels in the deep part of the brain."

{¶ 8} Moody's emergency room treating physician from Good Samaritan Hospital also testified that Moody suffered a "blunt trauma" and that she "would find

it hard to have someone have that injury from a punch one time," because it requires a significant amount of force to break a bone and cause the amount of bleeding that she had seen on Moody's CAT scan.

{¶ 9} Evans did not call any witnesses at trial. In cross-examining the State's witnesses, the defense's main focus appears to have been to try to undermine the State's position – presented through medical and eyewitness testimony – that Evans hit Moody with a gun, rather than with his fist.

{¶ 10} Evans was indicted on felonious assault (serious physical harm) (Count One), felonious assault (deadly weapon) (Count Two), murder (proximate result of felonious assault - serious physical harm) (Count Three), murder (proximate cause of felonious assault - deadly weapon) (Count Four), involuntary manslaughter (felonious assault - serious physical harm) (Count Five), involuntary manslaughter (proximate result of felonious assault - deadly weapon) (Count Six), and one count of having a weapon under disability (Count Seven). A jury found him guilty on all counts. The trial court merged Counts One, Two, Four, Five, and Six into Count Three and imposed a mandatory sentence of fifteen years to life. The court imposed an additional mandatory five-year sentence on Count Seven, to be served consecutively.

{¶ 11} Evans raises three assignments of error on appeal.

II

{¶ 12} Evans's first assignment of error states:

{¶ 13} "THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS SUPPORTED BY INSUFFICIENT EVIDENCE."

{¶ 14} Evans claims that his conviction was supported by insufficient evidence and was against the manifest weight of the evidence because "only one of the multiple eye-witnesses claim to have seen a weapon actually used in the assault of Mr. Moody," and no handgun was ever found that could be tied to the crimes.

{¶ 15} An argument regarding the sufficiency of the evidence challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.

{¶ 16} In contrast, when reviewing an argument based on the weight of the evidence, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

{¶ 17} One count of felonious assault was charged "by means of a deadly weapon ** to- wit: handgun," and one count each of murder and involuntary manslaughter was predicated upon Evans's commission of a felonious assault with a deadly weapon. Evans's strategy at trial appears to have been to undercut the State's theory that he had a gun in his hand when he struck Moody in the head, rather than to deny his involvement or that he hit Moody. Evans's argument on appeal with respect to the sufficiency and weight of the evidence also focuses on the evidence regarding his use of a gun to hit Moody.

{¶ 18} Candace Hester was, indeed, the only witness who testified that she saw a weapon in Evans's hand when he hit Moody. Nonetheless, her testimony, if believed by the jury, was sufficient evidence that Evans possessed a deadly weapon and used it in the commission of the offenses. The jury could have – but was not required to – discredit Hester's testimony because she was the only person to testify that Evans had a weapon in his hand when he hit Moody. Several other witnesses testified that Evans had a gun in his hand moments before he struck Moody, and the coroner and emergency room physician testified that they associated his type of injury with blunt force trauma not usually inflicted by a fist. The jury could have reasonably concluded that Hester's testimony was credible and that other witnesses' testimony corroborated Hester's testimony.

{¶ 19} Evans also points to Hester's friendship with Moody as a basis to discredit her testimony. In fact, many of the witnesses were family, friends, or acquaintances with Evans and/or Moody. Hester testified that Moody was an acquaintance of hers from middle school and a friend of a friend; the defense did

not inquire further about the nature of her relationship with Moody on cross-examination. Such relationships are one factor to be considered by a jury in weighing the evidence, but they do not require that a witness's testimony be disregarded. The jury was entitled to give these relationships, including Hester's acquaintance with Moody, whatever weight it felt was appropriate after hearing the witnesses' testimony.

{¶ 20} The State's evidence, if believed, could have convinced the jury of Evans's guilt beyond a reasonable doubt. Thus, Evans's conviction was not supported by insufficient evidence. Further, considering the record before us, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice in reaching the verdicts that it did. Evans's conviction was not against the manifest weight of the evidence.

{¶ 21} The first assignment of error is overruled.

III

{¶ 22} Evans's second assignment of error states:

{¶ 23} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY ALLOWING A LAYPERSON TO PROVIDE EXPERT TESTIMONY."

{¶ 24} Evans claims that emergency room physician Kindra Engle testified "beyond the scope of the observations she was qualified to testify to" and that she "speculated" that Moody's injury would have caused him permanent incapacity if he had lived. He contends that she also testified "without any evidence or scientific data as support nor with any first or second hand knowledge, that some blunt object

must have been used," which was the ultimate issue for the jury.

{¶ 25} Evid.R. 702 states: "A witness may testify as an expert if all of the following apply: (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. ***" Generally, "determinations of expert qualifications to testify are within the discretion of the trial court." *State v. Awkal* (1996), 76 Ohio St.3d 324, 331.

{¶ 26} We do not understand Evans's references to the emergency room physician's testimony about medical treatment as being that of a "layperson." Although the State did not expressly assert that it was calling Dr. Engle as an expert witness, it did establish her education, training, and experience and the fact that she was licensed to practice medicine in Ohio. Under Ohio law, a doctor licensed to practice medicine may testify as an expert on medical issues. *State v. Snodgrass*, 177 Ohio App.3d 556, 2008-Ohio-4019, ¶7-8. Her testimony also satisfied the requirements of Evid.R. 702. Evans objected to one question asked of Dr. Engle on direct examination – which related to whether Moody's injury could have been inflicted by a "punch" – on the basis of "foundation;" he did not object to Engle's testimony at trial on the basis that she was not qualified to testify as an expert on medical matters. Evans's assertion that Dr. Engle was a "layperson" who was improperly allowed to testify as an expert on medical issues is without

merit.

{¶ 27} Evans also contends that Dr. Engle's testimony was improper because she was allowed to address the "ultimate fact to be determined by the jury." His argument is premised, in part, on his claim that Dr. Engle did not testify as an expert. As Evans sees it, the ultimate issue was whether he had a gun in his hand when he hit Moody on the side of the head.

{¶ 28} The Rules of Evidence permit an expert to offer an opinion on an ultimate issue, which the jury was empaneled to decide. *State v. Rosas*, Montgomery App. No. 22424, 2009-Ohio-1404, ¶42, citing *State v. Stowers* (1998), 81 Ohio St.3d 260-263; Evid.R. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."). What an expert may not do is offer an opinion on the credibility or veracity of another witness. *State v. Boston* (1989), 46 Ohio St.3d 108, syllabus; *State v. Tobin*, Greene App. No. 2005 CA 150, 2007-Ohio-1345, ¶24. Testimony that provides additional support for the truth of the facts testified to by another witness or which assists the fact finder in assessing witnesses' veracity does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination. *Stowers,* 81 Ohio St.3d at 263.

{¶ 29} At trial, Dr. Engle described how bleeding between the skull and outer brain is often indicative of blunt trauma to the side of the head. She stated that, in this case, bleeding from Moody's left ear (near the bleeding on his brain) also suggested that he had suffered blunt trauma on the side of his head. In

expressing her opinion that she would find it hard to believe that a fist caused Moody's injury, she explained: "[b]ecause it would take a significant amount of force to break a bone, cause that much bleeding ***. But that is just my assumption."[1] Dr. Engle did not claim to have specific information about how Moody was injured.

{¶ 30} Dr. Engle described the nature of Moody's injury and provided some insight into the amount of force that would typically be required to inflict such an injury. The coroner offered similar testimony, stating that Moody suffered a "very large fracture" and had "shearing" of the blood vessels deep in his brain, and that his injury was "[not] consistent with just being punched with the naked fist." This testimony assisted the jury without usurping its role, and it was not improper.

{¶ 31} Finally, Evans contends that it was improper for Dr. Engle to testify "over objection, [that] the injuries Mr. Moody sustained would have caused permanent incapacity." He claims that this was "speculation" on "one of the issues to be determined by the jury," which was impermissible because Dr. Engle was not an expert. We have already addressed Engle's qualifications as an expert and rejected Evans's position that she did not testify as an expert. The coroner provided testimony similar to Engle's about whether permanent incapacity would have existed if Moody had survived, and it is undisputed that Moody died of his injuries. We are unpersuaded that Evans suffered any prejudice from Dr. Engle's testimony about whether Moody would have suffered permanent incapacity if he had survived.

---

[1] Dr. Engle did not state her views about the cause of the injury in the form of an "opinion" based on her expertise, and Evans did not object on this basis.

{¶ 32} The second assignment of error is overruled.

IV

{¶ 33} Evans's third assignment of error states:

{¶ 34} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY FAILING TO RULE ON HIS PRETRIAL MOTION FOR APPOINTMENT OF AN INVESTIGATOR."

{¶ 35} Evans contends that the trial court erred in failing to rule on his "Motion for Authorization to Obtain Services of an Investigator" before trial.  The motion was filed on March 2, 2010, twenty days before trial, and it requested the following: "to employ R.L. Emmons as the investigator.  While counsel can and will interview witnesses to the event[,] counsel cannot act as a witness to refute any inconsistencies in their accounts."

{¶ 36} According to the entry which granted Evans's motion after trial, the investigator that he hired was actually named Douglas Heard.  Heard's name appears on the defense's pre-trial witness list (March 15, 2010), although he was not called as a witness at trial.  The State also asserts that defense counsel "certified the expenses incurred by the investigator" in documents filed with the court.  While these documents are not contained in the record before us, the clerk's office's docket of the case does reflect that, after the notice of appeal was filed, Evans's trial attorney filed a fee request that included an Invoice requesting the payment of fees to investigator Douglas Heard for "professional services rendered."

{¶ 37} Although Evans's brief suggest that no investigation was conducted

and that "we cannot determine if [such an] investigation would have yielded exculpatory evidence," nothing in the record before us suggests that Evans was, in fact, denied investigative services. And there is not even the allegation of any prejudice. It appears that he did have the benefit of an investigator before trial, notwithstanding the court's failure to formally rule on his motion before trial.

{¶ 38} Accordingly, the third assignment of error is overruled.

V

{¶ 39} The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Carley J. Ingram
Jay A. Adams
Hon. Mary Katherine Huffman